23CA0139 & 23CA0596 MarkWest v Rose 04-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals Nos. 23CA0139 & 23CA0596
City and County of Denver District Court No. 18CV34272
Honorable Jill D. Dorancy, Judge
Honorable Darryl F. Shockley, Judge

---

MarkWest Liberty Midstream & Resources, L.L.C., a Delaware limited liability company,

Plaintiff-Appellee and Cross-Appellant,

v.

John W. Rose, as litigation trustee for Meridien Litigation Trust,

Defendant-Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 24, 2025

---

Snell & Wilmer L.L.P., James Kilroy, Ellie Lockwood, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant

Davis Graham & Stubbs LLP, Theresa Wardon Benz, Claire E. Mueller, Hannah McCrory, Denver, Colorado, for Defendant-Appellant and Cross-Appellee

¶ 1     Meridien Energy, L.L.C. (Meridien), through its litigation trustee, John W. Rose, appeals the district court's judgment partially in favor of MarkWest Liberty Midstream & Resources, L.L.C. (MarkWest). MarkWest, in turn, cross-appeals the district court's judgment partially in favor of Meridien. We affirm in part, reverse in part, and remand with directions.

## I.     Background

¶ 2     In 2018, MarkWest hired Meridien to construct an approximately eleven-mile portion of a longer natural gas liquids pipeline project in West Virginia. Meridien and MarkWest entered into a "Lump Sum Pipeline Construction Contract" (the Contract) on March 9, 2018, which specified Meridien would complete the pipeline project by November 15, 2018, in exchange for $34,814,000. The project was greatly delayed, however, and by October 16, 2018, Meridien had completed only approximately 150 feet of the pipeline. The cause of the delays was heavily contested at trial.

¶ 3     On October 8, 2018, Meridien wrote to MarkWest, requesting the work schedule be amended and demanding $16,099,986.00 in additional compensation for delays and costs that Meridien

attributed to MarkWest and to weather events (the Demand Letter). On October 16, MarkWest terminated the Contract for cause, alleging Meridien was responsible for environmental noncompliance and project delays. MarkWest hired new contractors, but the entire pipeline project was not finished until July 2019.

¶ 4    MarkWest sued Meridien in November 2018, and Meridien soon counterclaimed. As relevant to this appeal, MarkWest and Meridien both raised claims for breach of contract and breach of the implied duty of good faith and fair dealing. Meridien also raised a claim for unjust enrichment that the court decided after trial.

¶ 5    After a fifteen-day trial, the jury ruled partially in favor of MarkWest and partially in favor of Meridien. It found that Meridien (1) breached the Contract and (2) breached the implied duty of good faith and fair dealing. The jury awarded MarkWest $16,008,831.77 in damages for the former and no damages for the latter. It also found, however, that MarkWest had similarly breached its implied duty of good faith and fair dealing, and it awarded Meridien $1,510,362.00 in damages. The court then decided Meridien's counterclaim for unjust enrichment and awarded Meridien

$2,562,994.15 plus interest. This appeal and cross-appeal followed.

¶ 6     Part II of this opinion addresses Meridien's appeal, which pertains to each party's claims for breach of the implied duty of good faith and fair dealing, an evidentiary ruling, and a jury instruction. We affirm the district court's decisions on each issue.

¶ 7     Part III addresses MarkWest's cross-appeal, which pertains to Meridien's unjust enrichment counterclaim. In its cross-appeal, MarkWest argues that the district court (1) erroneously allowed the counterclaim to proceed and (2) applied the wrong interest rate to Meridien's restitution award. We affirm the restitution award for unjust enrichment but reverse as to the applicable interest rate.

## II.     Meridien's Appeal

### A.     The Jury's Verdicts

¶ 8     Meridien first contends that the jury's verdicts are inconsistent and irreconcilable.

#### 1.     Additional Background

¶ 9     After the jury issued its verdicts, Meridien moved for judgment notwithstanding the verdict (JNOV) pursuant to C.R.C.P. 59, or, alternatively, a new trial. As relevant here, Meridien argued that

the jury instructions presented the breach of the implied duty of good faith and fair dealing claims as substantive claims *and* affirmative defenses — therefore the jury could not have awarded damages when it found both parties breached the implied duty. Meridien cited several jury instructions and the verdict form to support its contentions.

¶ 10    Instruction 14 informed the jury about material breaches of contract, stating that "[a] breach is not material if the other party receives substantially what it contracted for.  In determining whether a breach is material, you may consider the nature of the promised performance, the purpose of the contract, and whether any defects in performance have defeated the purpose of the contract."  The instruction added that "[a] material breach by one party excuses performance by the other party to the contract."

¶ 11    Instruction 16, concerning MarkWest's breach of contract claim, provided that if the jury found that MarkWest proved the elements of breach of contract, the jury "must consider Meridien's affirmative defenses," and if "any one of those affirmative defenses has been proved by a preponderance of the evidence, then [its] verdict must be for Meridien."  Instruction 17 stated that

4

"MarkWest has raised breach of the implied duty of good faith and fair dealing as both a counterclaim and affirmative defense."

¶ 12     The instructions for Meridien's claims mirrored these instructions. Instruction 21 provided that Meridien "raised breach of the implied duty of good faith and fair dealing as both a counterclaim and affirmative defense." Instruction 20 provided that if the jury found that Meridien proved its claim, the jury was required to "consider MarkWest's affirmative defenses. . . . If [it] [found] that any one of those affirmative defenses ha[d] been proved by a preponderance of the evidence, then [its] verdict must be for MarkWest."

¶ 13     Instruction 25, concerning damages, provided that if the jury found "in favor of MarkWest on its claim of breach of contract or breach of the implied duty of good faith and fair dealing, then [it] may award [MarkWest] damages." And if the jury found "in favor of Meridien on its counterclaim of breach of contract or breach of the implied duty of good faith and fair dealing, then [it] may award [Meridien] damages." Instruction 26 informed the jury that if it found "for either party on more than one claim for relief," then it could "award it damages only once for the same damages."

5

¶ 14    Using these instructions, the jury answered "yes" to three
questions on the verdict form:

> Do you find by a preponderance of the
> evidence that MarkWest is entitled to recover
> from Meridien on its claim for breach of
> contract, after taking into account any
> affirmative defenses proven by Meridien by a
> preponderance of the evidence? . . .
>
> Do you find by a preponderance of the
> evidence that MarkWest is entitled to recover
> from Meridien on its claim for breach of the
> implied duty of good faith and fair dealing,
> after taking into account any affirmative
> defenses proven by Meridien by a
> preponderance of the evidence? . . .
>
> Do you find by a preponderance of the
> evidence that Meridien is entitled to recover
> from MarkWest on its claim for breach of the
> implied duty of good faith and fair dealing,
> after taking into account any affirmative
> defenses proven by MarkWest by a
> preponderance of the evidence? . . .

¶ 15    The jury answered "no" to one question:

> Do you find by a preponderance of the
> evidence that Meridien is entitled to recover
> from MarkWest on its claim for breach of
> contract, after taking into account any
> affirmative defenses proven by MarkWest by a
> preponderance of the evidence?

¶ 16    After a hearing on Meridien's JNOV motion, the court orally
ruled that the jury's verdict "finding that both parties breached the

contract, . . . and damaged each other in different amounts . . . is not inconsistent and is in keeping with what the Jury received as evidence in the case." The court added that the parties sought "a lot of different categories of damages and it was . . . within the Jury's discretion to award part, percentage, or combination of those." It rejected Meridien's motion for JNOV or a new trial.

### 2. Analysis

¶ 17 Meridien argues on appeal that the jury's verdicts are inconsistent and cannot be reconciled, and the district court should have granted its JNOV motion. Meridien contends that the jury could not have found for MarkWest on its breach of contract and breach of implied duty claims and *also* for Meridien on its breach of implied duty claim because the jury instructions provided that the implied duty claims operated as affirmative defenses. Therefore, the jury could not have awarded damages to either party. As a result, Meridien argues each party's damages awards should be vacated, or, alternatively, that a new trial is warranted.

¶ 18 MarkWest counters that (1) the jury's verdicts are reconcilable because the jury did not find material breaches; (2) the jury instructions do not support Meridien's interpretation; and (3) case

7

law does not require the implied duty breach to serve as an affirmative defense.

### a. Standard of Review

¶ 19    We review a district court's denial of a motion for JNOV de novo. *Parks v. Edward Dale Parrish LLC*, 2019 COA 19, ¶ 9. "A jury verdict will not be disturbed for inconsistency if a review of the record indicates any basis for the verdict." *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 486 (Colo. App. 2003).

> Our task is to examine carefully the instructions, the verdict forms, and the evidence, and to determine from the record whether there is competent evidence from which the jury logically could have reached its verdicts and to attempt to reconcile the jury's answers to special verdicts, if possible. Also, if there is a view of the case that makes the jury's answers consistent, they must be resolved that way.

*H & H Distribs., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 663 (Colo. App. 1990).

### b. Application

¶ 20    The jury's verdicts can be reconciled. The instructions state that each party's implied duty claims were raised as both affirmative defenses and claims or counterclaims and that the jury

8

was required to consider each party's respective affirmative defenses. But merely because the implied duty claims were raised as counterclaims and affirmative defenses does not mean that the jury was required to find that the affirmative defenses had been proved. Instead, the jury could have considered each party's affirmative defenses and found that only the substantive claim or counterclaim had been established — and the best evidence for this possibility is that the jury awarded each party damages.

¶ 21     "A claim is 'the aggregate of operative facts which give rise to a right enforceable in the courts . . . .'" *Dinosaur Park Invs., L.L.C. v. Tello*, 192 P.3d 513, 516 (Colo. App. 2008) (citation omitted). Conversely, "an affirmative defense is not merely a denial of an element of a plaintiff's claim, but rather it is a legal argument that a defendant may assert to require the dismissal of a claim, notwithstanding the plaintiff's ability to prove the elements of that claim." *Soicher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 46, ¶ 18. An affirmative defense, therefore, differs from a claim in that it *defeats* a potentially enforceable right to damages. In other words, an affirmative defense is not a means to obtain damages — it negates a claim for damages.

¶ 22    Instruction 25 made this distinction when it provided that if the jury found for either Meridien or MarkWest for its respective "*claim*" or "*counterclaim*" "then [the jury] may award it damages." (Emphases added.)  And Instruction 26 recognized this when it provided that if the jury "find[s] for either party on more than one *claim* for relief, [the jury] may award it damages," though "only once for the same damages."  (Emphasis added.)

¶ 23    Using the instructions and the verdict form, we can reconcile the jury's verdict in a way that recognizes this distinction.  Namely that the jury considered each party's affirmative defenses but declined to find that each party's affirmative defenses *totally* defeated each other's claims.  Instead, the jury found that MarkWest proved the elements of its breach of contract and breach of implied duty of good faith and fair dealing claims, but it only awarded damages for the breach of contract claim.  But it also found that Meridien proved the elements of its breach of implied duty of good faith and fair dealing counterclaim, meriting damages.  *See Centric-Jones Constructors*, 100 P.3d at 486; *H & H Distribs.*, 812 P.2d at 663 ("[I]f there is a view of the case that makes the jury's answers consistent, they must be resolved that way.").

Similarly, the jury may have determined that each party's breaches of the duty of good faith and fair dealing were not material, consistent with Instruction 14.

¶ 24    Admittedly, Instructions 17 and 21 were not models of clarity when they provided identical elements for breaches of the implied duty with no means for the jury to indicate whether it found the parties proved them as affirmative defenses *or* claims.  But we have found no binding authority that requires breaches of the implied duty of good faith and fair dealing to serve as affirmative defenses. *See Soicher*, ¶¶ 10, 26 (contrasting an insured's duty of good faith and fair dealing with the duty to cooperate; noting that while "noncooperation will likely bar a claim for benefits," a "violation of the implied covenant of good faith and fair dealing, in contrast, will not necessarily do so"; and recognizing that the insurer attempted to raise the implied duty as an affirmative defense).

¶ 25    When the jury awarded Meridien damages for breach of the duty of good faith and fair dealing, it necessarily decided that Meridien proved the elements of a *counterclaim.*  However, it could have decided that the breach wasn't material — and therefore, that Meridien had not proved an affirmative defense.  Similarly, the jury

11

found MarkWest proved its *claims* for a breach of the implied duty and breach of contract. But consistent with Instruction 26, the jury could not award MarkWest duplicative damages, hence the award of $0.

¶ 26 Because this view resolves the alleged inconsistency in the jury's verdict, we may not disturb it. *See Centric-Jones Constructors*, 100 P.3d at 486. The district court did not err.

### B. The Smithburg Project and Redlines Evidence

¶ 27 Next, Meridien argues that the district court erred by excluding evidence of another MarkWest project, Smithburg, that allegedly would have supported Meridien's theory at trial.

#### 1. Additional Background

¶ 28 While Meridien was building its portion of the pipeline, MarkWest was working on a nearby project — the construction of a natural gas processing plant called Smithburg. Meridien offered evidence concerning the Smithburg plant to show that it shared similarities with the pipeline — namely, that both projects (1) experienced the same heavy rainfall events; (2) required modified

erosion and sediment plans (E&S plans);[1] (3) received similar environmental notices of violations (NOVs); and (4) shared the same MarkWest personnel. Meridien wanted to argue that, despite their similarities, MarkWest treated its pipeline project differently.

¶ 29 Meridien offered a PowerPoint presentation prepared for a meeting between MarkWest and the West Virginia Department of Environmental Protection (WVDEP) regarding the Smithburg project. An unredacted version of the PowerPoint showed that (1) Smithburg received several inches of rain in June through August of 2018 in short periods and seven inches of rain from a tropical storm in September; (2) MarkWest modified its E&S plans twice in June 2018 through "redline and enhanced onsite controls"; and (3) MarkWest received four NOVs from the WVDEP in 2018 for Smithburg (two in June and August and two in September), including for failing to modify its E&S plans.

¶ 30 According to Meridien, the WVDEP found that Meridien, and in turn MarkWest, violated environmental regulations on the pipeline project because of the same heavy rainfall experienced at

---

[1] A witness testified at trial that E&S plans are "designed to control sediment in soil erosion."

Smithburg. Meridien pointed to MarkWest's July 2018 response to a WVDEP NOV, which represented that Smithburg's deficiencies resulted from "rainfall amounts . . . [before] the inspection." Further, in MarkWest's subsequent corrective actions plan for the pipeline project, prepared in August 2018, it represented to the WVDEP that it would redline and modify its E&S plan, but Meridien never received the redlines.

¶ 31 Meridien also highlighted that MarkWest's letter terminating the Contract for cause in October 2018 stated that MarkWest did not believe redlining plans "was necessary for Meridien to adequately address the myriad environmental concerns" and that the existing E&S plans reflected that Meridien should have been able to adjust the plans in the field.

¶ 32 Meridien sought to introduce the PowerPoint to argue that MarkWest treated Meridien differently — by claiming that heavy rain caused the issues at Smithburg, while blaming Meridien for the issues at the pipeline project — as evidenced by MarkWest's willingness to create redlines at Smithburg while not providing redlines for the pipeline project. Smithburg and redlining came up several times during trial.

## 2. Pertinent Trial Testimony and Smithburg Evidence

¶ 33     Dustin Vincent, MarkWest's engineering supervisor, testified that MarkWest would not have needed to modify its E&S plans for the project had Meridien properly implemented the existing plans, and that it was Meridien's responsibility to make adjustments as needed. On cross-examination, Vincent testified that MarkWest never made the redlines it told the WVDEP it would create and that MarkWest relied on its original E&S plans.

¶ 34     Meridien then sought to introduce the PowerPoint to challenge Vincent's testimony. MarkWest objected, arguing that the Smithburg evidence was irrelevant and prejudicial and that only a redacted version of the PowerPoint (which only showed information about the pipeline project) was admissible. The court did not admit the unredacted PowerPoint, finding that while it may have been relevant, exploring a "project in which [Meridien] wasn't actually involved . . . [risked] confusing the jury more so than they already may be with all the information that they've received." The court excluded the unredacted PowerPoint on the basis that the risk of prejudice and confusion outweighed its relevance.

¶ 35    Meridien's counsel reiterated that while "this is not to rebut the redline issues," the evidence did, in fact, rebut (1) the redline issues by contravening testimony that MarkWest had "never done redline plans for another project" and (2) MarkWest's suggestion that it was a "great steward[] of the environment."  The court noted that Meridien could ask Vincent "more questions about the redlining," and Meridien's counsel asked to revisit the matter after laying more foundation.  Meridien's counsel then asked: "You would agree . . . that . . . MarkWest has in the past actually submitted redline plans for projects; right?"  Vincent responded, "I'm involved in projects in my area, unaware of projects outside of my area. There's a great possibility that they've done that."

¶ 36    Shannon Miles, MarkWest's senior environmental coordinator during the pipeline project in 2018, later testified about an email her supervisor sent to a third-party environmental inspector, Shawn Johnston, who oversaw Meridien's portion of the pipeline. In the email, the supervisor asked Johnston to "coordinate with the other [environmental inspectors] on this project in order to 'red line' the approved E&S plan" for the various portions of the pipeline, and once those redlines were approved, they would be "provided to the

16

contractors to implement in the field." Miles testified that she understood this to mean that after MarkWest received the WVDEP NOV "we needed to add . . . redlining or field modifications."

¶ 37 Miles added, however, that Meridien "had requested that we, as MarkWest, put those changes on the E&S drawing, which isn't something we've ever done before that. It's not the typical process." Instead, Miles stated the typical process

> would be that those areas would be observed either by the contractor or the environmental inspector on these areas that need [to be] tweaked or added to. It would be a discussion between those two parties, and it would be implemented in the field, and that really would be the highest level it would get to. And those changes would be documented on the E&S plan sheets or reference what's been added or changed.

¶ 38 Miles also testified that MarkWest attempted to make the requested redline changes, but it became difficult because it lacked "a procedure for doing it because we had never done it before." And because most of Meridien's "E&S controls were either implemented incorrectly or hadn't been maintained, it was very difficult . . . to evaluate, if that control would need [to be] field modified or tweaked because they were unable to evaluate if it was functional during a

17

rain event." Vincent was referring to these redlines when he testified that MarkWest eventually abandoned the plan to create redlines and kept the original E&S plans.

¶ 39    Meridien's counsel later cross-examined Miles about Smithburg and whether the same WVDEP inspector worked on Smithburg and the pipeline project. MarkWest's counsel objected for relevance, again arguing that the Smithburg evidence would cause confusion. In a sidebar discussion, Meridien's counsel argued that the questioning was relevant because Miles gave a presentation — referring to the PowerPoint — "to the West Virginia DEP trying to explain away problems at not only [Smithburg] but this project." Referring to the testimony concerning the email and field modifications of E&S plans, Meridien's counsel added that Miles

> testified they didn't revise the E&S plans here because they had never done that before. This document shows [that on Smithburg] they did it twice when there were failures due to rain events. It's impeachment. It also shows that they used the same E&S plan in that project and mundane rain caused it to fail, meaning she had that knowledge and could have required upgraded E&S plans from the beginning and certainly knew she needed to modify them once they saw the failures.

¶ 40 Meridien's counsel further argued in the sidebar that the evidence was relevant because "there's been a suggestion that [Meridien's] work . . . brought scrutiny to the entire project by" the WVDEP inspector. Thus, the testimony was relevant because it "shows that [Miles] had prior relationships with [the WVDEP inspector] where he wrote [NOVs] for the [Smithburg] Plant. Our contention is that experience brought him extra scrutiny of our project, not the other way around."

¶ 41 The district court excluded the testimony, stating that the Smithburg project was "a rabbit hole" and that while it understood that Meridien sought to use the evidence to impeach Miles' prior statements, "it's a completely different project. Not only is it a different project, obviously the same company is involved, but it's not a pipeline . . . . It will open up the possibility of going down a road that . . . will be confusing." The court added that "information . . . about the relationship with the [WV]DEP is inappropriate under the circumstances," as it was offered for an improper purpose.

¶ 42 A few days later, the jury heard Johnston's video deposition testimony. As the lead environmental inspector for the entire

pipeline project, he testified that he worked on various MarkWest projects (including Smithburg) and discussed his frustrations with Meridien's environmental violations and MarkWest's failure to reprimand Meridien. Johnston also stated, "I had a lot of projects going on. All of them ran beautifully except for the one Meridien was on. I could handle them by myself, all other ones, because they ran so perfect. . . . The frustration is from one project. I did multiple projects from MarkWest flawlessly and good."

¶ 43 Meridien filed a bench brief during trial, arguing that the Smithburg evidence was admissible because it was relevant and that MarkWest had "opened the door" through Miles' and Johnston's testimony. It argued that, without the Smithburg evidence, MarkWest could mislead the jury into thinking only Meridien struggled with rainfall and received NOVs from the WVDEP and that it was not typical or necessary for MarkWest to redline E&S plans.

¶ 44 The district court excluded the evidence. The court ruled that "it's not the same type of project" and that "it will take us into a black hole of testimony and evidence and rebuttal" while facing "time constraints at this point into our third week" of trial. Thus,

20

the court excluded the evidence under CRE 401, 402, 403, and 404(b).

### 3.    Analysis

¶ 45    Meridien argues on appeal that the Smithburg evidence was directly relevant because it (1) would have shown that MarkWest treated Meridien differently than other contractors by blaming Meridien for environmental issues and delays while attributing similar issues to rain at Smithburg; (2) would have refuted MarkWest's testimony that MarkWest did not redline E&S plans or that unmodified E&S plans would have been effective; and (3) would show that other MarkWest projects did not run "perfectly" — contradicting Johnston's testimony.  Meridien argues the exclusion prejudiced it and warrants a new trial.

¶ 46    MarkWest counters that the district court properly excluded the irrelevant evidence.  MarkWest also contends that any alleged error is harmless because Meridien introduced evidence on redlines and whether MarkWest was a "good steward of the environment," so the evidence would have been cumulative.

### a. Standard of Review

¶ 47     "In general, all relevant evidence is admissible, and the Colorado Rules of Evidence strongly favor admission of material evidence." *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (citations omitted).  But a district court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403.

¶ 48     "[T]rial courts have broad discretion to determine the admissibility of evidence," *CORE Elec. Coop. v. Freund Invs., LLC*, 2022 COA 63, ¶ 28, so we review "evidentiary rulings for abuse of discretion," *Ronquillo v. EcoClean Home Servs., Inc.*, 2021 CO 82, ¶ 12.  "A district court abuses its discretion when its decision is 'manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law.'" *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 29 (citation omitted).

¶ 49     We will not disturb a district court's evidentiary rulings "unless a substantial right of the party is affected."  CRE 103(a).  "An error affects a substantial right only if 'it can be said with fair

22

assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *CORE Elec. Coop.*, ¶ 41 (quoting *Bly*, 241 P.3d at 535). "If an error does not affect a party's substantial right, it must be deemed harmless and is not grounds for reversal." *Bly*, 241 P.3d at 535; *see also* CRE 103(a); C.R.C.P. 61. Moreover, "any error in excluding . . . cumulative evidence is harmless and does not constitute reversible error." *In re Estate of Fritzler*, 2017 COA 4, ¶ 12.

### b. Application

¶ 50 The district court did not err by excluding the Smithburg evidence. To start, Meridien's chief argument — that the Smithburg evidence was necessary to refute testimony that MarkWest never made redlines — seems to stem from a fundamental misunderstanding about Vincent's and Miles' testimony and the redlines MarkWest initially agreed to make and provide to Meridien. From our review of the record, no witness asserted that MarkWest never made redlines.

¶ 51 When reviewed in context, Miles and Vincent testified that after the WVDEP sent MarkWest and Meridien NOVs, MarkWest represented to the WVDEP that it would redline its E&S plans.

Both witnesses testified that the procedure for redlining was to have their environmental inspectors work with contractors to identify necessary changes, which were then submitted to MarkWest for approval. And Miles testified that Meridien's request for MarkWest to visit the sites and make the redlines itself was out of the norm but was attempted before the effort was deemed unfeasible.

¶ 52    None of this testimony gave the jury the misleading impression that MarkWest was unwilling to make redlines to E&S plans, or that it never undertook such modifications. It just explained MarkWest's redlining process. Indeed, none of Meridien's offers of proof explained how the Smithburg PowerPoint, or the fact that MarkWest made redlines to the Smithburg E&S plans, explicitly contradicted this testimony. Simply because MarkWest made changes to its Smithburg E&S plans does not mean that MarkWest created the redlines without its contractor's input. Further, the district court aptly pointed out that the Smithburg gas processing plant project was completely different from the pipeline project. And Meridien's offers of proof never sufficiently addressed the significant differences between these unrelated projects.

¶ 53    As a result, the points Meridien sought to make through the Smithburg evidence, while relevant, were discussed by other witness testimony and were not essential to refute the testimony of any witness, including Vincent, Miles, and Johnston.  And the district court did not abuse its discretion by finding that admitting evidence concerning an *entirely* new project — one that differed completely from the pipeline project save for its location and MarkWest's involvement — would have been unnecessarily confusing.  *See* CRE 403.

¶ 54    Moreover, even if the Smithburg evidence was improperly excluded, we cannot conclude that its exclusion affected Meridien's substantial rights by substantially influencing the outcome of the case or impairing the trial's basic fairness.  *See CORE Elec. Coop.*, ¶ 41.  Other admitted evidence supported the points Meridien sought to make via the Smithburg evidence.  *See* CRE 403.  Indeed, the jury heard *voluminous* testimony on the redlining issues, including (1) about redlining generally; (2) that Meridien did not receive the redlines; (3) whether MarkWest should have provided redlines to Meridien; (3) that other contractors did not receive redlines and received similar environmental NOVs; (4) the

difficulties rain caused; (5) whether E&S plan modifications were necessary; (6) that MarkWest received environmental NOVs; and (7) whether MarkWest made redlines in response. And the jury even heard testimony about how the contractors that replaced Meridien struggled with similar environmental compliance issues, but Meridien was the only contractor terminated.

¶ 55     Therefore, the district court did not err, and any assumed error would be harmless. *See Bly*, 241 P.3d at 535; *Fritzler*, ¶ 12.

C.     The Permissive Adverse Inference Instruction

¶ 56     Next, Meridien argues that the district court erred by giving a permissive — rather than a mandatory — adverse inference instruction concerning MarkWest's destruction of redlined E&S plans for the pipeline.

1.     Additional Background

¶ 57     Early in the litigation, Meridien filed a motion to compel MarkWest to produce the partially completed redlines that MarkWest made in the field before it abandoned the effort, and which MarkWest failed to produce during discovery. The court ordered MarkWest to produce the redlines after finding they remained under MarkWest's control. But MarkWest notified the

26

court that despite its efforts to locate the redlines, it could not find them (other than a hardcopy of some "handwritten notes").

¶ 58 Before trial, Meridien requested that the court "instruct the jury to draw an adverse presumption, or in the alternative, inference" that the redlines would have been unfavorable to MarkWest. Meridien argued that — because there was no dispute that the redlines existed after litigation commenced but were not preserved — the court should find that MarkWest willfully, or at least negligently, destroyed the redline evidence.

¶ 59 Meridien requested, in pertinent part, the following instruction:

> It is the duty of a party not to take action that will cause the destruction or loss of relevant evidence, hindering the other side from making its own examination and investigation of all potentially relevant evidence relating to whether that party's fault caused the incident in question.
>
> You are instructed that you must presume, by reason of MarkWest's failure to produce the "redlined" or otherwise modified, altered, or amended E&S Plans, that the evidence contained in those modified plans was unfavorable to MarkWest.

¶ 60 In the jury instructions conference, the court noted,

> [W]e've heard a lot about . . . the redlines, and we've heard testimony that some people think there was redlines out there somewhere. I don't know what happened to them. No one knows. I don't think there was anything willful or intentional. I think it was just negligence. Probably, they ended up somewhere on the floor of someone's F150 and never to be seen again.

¶ 61    Ultimately, the court rejected the requested mandatory instruction, instead tendering a permissive inference instruction:

> Before the trial of this case, MarkWest failed to produce any "redlined" or otherwise modified, altered, or amended E&S plans. *You may, but are not required to*, draw an inference that by reason of the loss of these E&S plans, the lost evidence was unfavorable to MarkWest.

(Emphasis added.)

## 2.    Analysis

¶ 62    Meridien argues on appeal that the court should have found that MarkWest's conduct was willful and reckless and therefore should have instructed the jury that it *must* presume the lost evidence was unfavorable to MarkWest. Thus, especially combined with the alleged errors concerning the Smithburg evidence, Meridien contends a new trial is warranted.

¶ 63    MarkWest responds that Meridien waived this issue for appeal because it invited any alleged error by requesting a mandatory *or* permissive presumption instruction.  MarkWest also contends that the permissive instruction was not an abuse of the district court's discretion because the court concluded there was no willful or intentional destruction of the redlines.

### a.    Standard of Review

¶ 64    "The ability to provide the jury with an adverse inference instruction as a sanction for spoliation of evidence derives from the trial court's inherent powers.  A trial court has broad discretion to permit the jury to draw an adverse inference from the loss or destruction of evidence." *Aloi v. Union Pac. R.R. Corp.*, 129 P.3d 999, 1002 (Colo. 2006) (citation omitted).  We review a district court's decision for an abuse of discretion, and "we will not overturn the trial court's imposition of an adverse inference unless the sanction is manifestly arbitrary, unreasonable, or unfair.  In determining whether the trial court abused its discretion, we must examine whether the rationales underlying the adverse inference supported giving the instruction as a sanction for spoliation." *Id.* (citation omitted).

29

¶ 65    To this end, "adverse inference instructions serve both a

punitive and a remedial purpose."  *Id.*  The punitive purpose "serves

to deter parties from destroying evidence in order to prevent its

introduction at trial," while the remedial purpose "serves to restore

the putative prejudiced party to the position it would have held"

absent spoliation.  *Id.*

¶ 66    As for the culpable party's state of mind, our supreme court

held in *Aloi* that there was "no useful distinction between destroying

evidence in bad faith and destroying evidence willfully."  *Id.* at 1003.

Therefore, it is not necessary for a district court to find that the

culpable party acted in bad faith to merit an adverse inference —

willfulness will suffice where it appears the evidence would have

been relevant to an issue at trial.  *Id.* at 1002-04 (holding that when

a defendant had notice of an impending lawsuit but failed to

preserve documents relevant to the litigation, this was sufficient for

a finding of willfulness justifying an adverse inference).

¶ 67    Further, the district court's "inherent power to impose a

punitive sanction is not limited to intentional spoliation of

evidence."  *Pfantz v. Kmart Corp.*, 85 P.3d 564, 568-69 (Colo. App.

2003).  Negligence may justify an adverse inference "to remediate

harm when the inference is 'reasonably likely to have been contained in the destroyed evidence.'" *Id.* at 569 (quoting *Rodriguez v. Schutt*, 896 P.2d 881, 884 (Colo. App. 1994)).

### b. Preservation and Invited Error

¶ 68 MarkWest's first argument is that Meridien waived this issue or invited any error when it requested a permissive inference as an alternative to the mandatory inference. We disagree.

¶ 69 "The doctrine of invited error captures the principle that 'a party may not complain on appeal of an error that he has invited or injected into the case; he must abide by the consequences of his acts.'" *Horton v. Suthers*, 43 P.3d 611, 618 (Colo. 2002) (citation omitted). It may apply when "a party requests that the court take a particular action and then later complains of that same action" or "one party expressly acquiesces to conduct by the court or the opposing party." *Id.* at 619. Similarly, "[w]aiver is 'the intentional relinquishment of a known right or privilege,'" but "a court must find some record evidence that the defendant intentionally relinquished a known right, indulging 'every reasonable presumption against waiver' and examining the totality of the

circumstances surrounding a party's conduct (or lack thereof)."

*Bernache v. Brown*, 2020 COA 106, ¶ 10 (citations omitted).

¶ 70     While Meridien requested a permissive inference as an alternative to its desired mandatory inference, raising an alternative argument does not meet the high bar for waiver or invited error. Alternative arguments do not necessarily show an intentional relinquishment of known rights.  *See Horton*, 43 P.3d at 619; *Brown*, ¶ 10; *see also City of West Palm Beach v. Visionair, Inc.*, 199 F. App'x 768, 770 n.1 (11th Cir. 2006) ("The doctrine of invited error does not preclude parties from making alternative arguments.").

¶ 71     We therefore conclude this issue is preserved.

### c.     Application

¶ 72     The district court did not abuse its discretion by tendering the permissive inference instruction.  Meridien contends that the district court should have found MarkWest's conduct to be willful, but even assuming the court had found MarkWest acted willfully, it was not required to issue an instruction mandating the jury impose an adverse presumption against MarkWest.  *See Aloi*, 129 P.3d at 1001, 1003-04 (a permissive instruction, "you *may* infer . . . that the evidence contained in such documents was unfavorable," was

proper when a district court found the defendant acted willfully) (emphasis added). Therefore, even if the court had found MarkWest acted willfully, it would have been within its discretion to tender a permissive inference instruction.

¶ 73 The district court also explicitly found that MarkWest did not act willfully or intentionally — and the record supports this determination. Indeed, we "cannot assume the district court's role to find facts and determine credibility. The district court was free to believe or disbelieve the witnesses." *Warembourg v. Excel Elec., Inc.*, 2020 COA 103, ¶¶ 35, 75 (citation omitted). And regardless, the only facts in the record Meridien points to as justification for the instruction are that the redlines existed and that MarkWest failed to preserve them — which, to be clear, may support (but do not require) a willfulness finding. *See Aloi*, 129 P.3d at 1003-04. Meridien's briefing points to no facts in the record that indicate a harsher instruction was necessary, certainly not to the point that the court abused its discretion by offering a permissive inference instruction.

¶ 74 Finally, it is important to note that the jury heard testimony concerning the redlines. The jury knew that they existed in some

form and that MarkWest started to create them but abandoned the effort. And, thanks to the instruction, the jury also knew that the redlines were not produced during discovery and that it *could* infer the redlines were unfavorable to MarkWest.

¶ 75　　Ultimately, the district court tailored its instruction to what it found was commensurate with MarkWest's conduct, which was within its discretion. *See Pfantz*, 85 P.3d at 568 ("The sanction should be 'commensurate with the seriousness of the disobedient party's conduct.'") (citation omitted); *see also Warembourg*, ¶¶ 57, 77. We may not disturb the court's findings, *Warembourg*, ¶ 75, and a permissive inference instruction served the appropriate remedial and punitive purpose rationales. *See Aloi*, 129 P.3d at 1002. We discern no error in the court's instruction.

### III.　MarkWest's Cross-Appeal

¶ 76　　In its cross-appeal, MarkWest raises two contentions of error. First, it argues that the district court erroneously allowed Meridien's unjust enrichment claim to proceed despite the underlying Contract. *See Bd. of Governors of Colo. State Univ. v. Alderman*, 2025 CO 9, ¶ 36. Second, it contends that the court applied the incorrect interest rate to Meridien's restitution award for

unjust enrichment.  We perceive no error with respect to the first argument, but we conclude that the court erroneously applied an 18% interest rate to the restitution award.  Therefore, we remand to the district court to apply the correct interest rate.

### A.    Background

¶ 77    As mentioned, the court heard Meridien's unjust enrichment counterclaim after trial.  Meridien's counterclaim asserted that it provided work and materials outside the Contract's scope at MarkWest's direction, MarkWest did not pay for those services, and MarkWest was unjustly enriched.  Meridien sought $2,562,994.15 in restitution, the amount stated in Invoice 31-8011 (the Invoice), which detailed the costs of the disputed work and materials.

¶ 78    Section 1.1 of the Contract required that Meridien perform "all workmanship, labor, materials, and equipment set forth in Exhibit 'A' [the Scope of Work], and as subsequently added by [MarkWest] in accordance with the terms of th[e] Contract."  Section 4, "Changes to the Scope of Work," required that

> Changes to the Scope of Work (for work in addition to that covered under the Lump Sum Fixed Price . . . and which is consistent with the original terms and intent of this Contract) shall be made only by a written change order

specifying the requested changes or additions, including changes to the Lump Sum Fixed Price . . . .

¶ 79     The allegedly out-of-scope work included (1) slip repair work to fix soil movement on steep terrain in a right-of-way; (2) road improvement work on public county roads; (3) work and materials related to "an unprecedented number of unidentified foreign [pipe]lines"; and (4) work and materials, including environmental control devices (ECDs) related to unforeseen and unprecedented "rainfall and extreme weather events."

¶ 80     Meridien's October 2018 Demand Letter to MarkWest detailed certain costs Meridien had incurred, including the work and materials underlying its unjust enrichment claim.  First, as to the slip repair work, the Demand Letter noted that "MarkWest asked Meridien to fix a pre-existing slip on a County Road (near Access Road 10) outside the Scope of Work."  Vincent testified that the slip repair work was "[w]ithin the scope of work."  However, in deposition testimony read to the jury, William Schettine, Meridien's chief executive officer, said that the slip repair work "had nothing to do with our construction" and that Meridien had requested a change order to cover the costs, which MarkWest rejected.

¶ 81    Later, Vincent discussed a document outlining MarkWest's internal responses to the Demand Letter.[2]  In this document — responding to Meridien's assertion about the slip repair work — MarkWest suggested that Meridien "was not 'required' to make any improvements" and "could have chosen to wait until [West Virginia Division of Highways (WVDOH)] made the repairs."

¶ 82    Second, Meridien contended that MarkWest asked it to "build, grade, stone, compact, and ditch" several miles of state and county roads, which were "not contemplated by the bid or initial scope of work" and went beyond the Contract's requirement that Meridien maintain roads.  MarkWest's internal response to this assertion noted that "[i]mproving portions of rural WVDOH Roads should have been part of Meridien's bid," and if Meridien was requesting "additional compensation," it was to refer to "[Section] 4.0 Changes to the Scope of Work."

¶ 83    Third, Meridien sought compensation for work related to foreign pipeline crossings that MarkWest failed to identify.  James Schettine, Meridien's president and general counsel, testified that

---

[2] It is unclear whether MarkWest ever sent this proposed response to Meridien.

MarkWest was responsible for identifying foreign pipelines and that while MarkWest identified seven foreign pipeline crossings, there were "50-plus" unidentified foreign lines, "including MarkWest's own lines that they failed to identify."

¶ 84    Construction alignment sheets, incorporated into the Contract as an exhibit, stated that there would "be no additional compensation for . . . having to work around existing utilities shown in the plans or as they are discovered during construction, whether they are shown or not." But James Schettine testified that, while it was common to find a few unidentified foreign lines, he had never, "in the history of our company, encounter[ed] 50 plus" lines, and this magnitude warranted additional compensation.[3] A pipeline engineering and development expert also testified that he found fifty-six unidentified lines. Even Vincent testified that "[i]t was a record book entry for the number of undisclosed foreign lines."

¶ 85    Fourth, Meridien sought recovery for out-of-scope work due to "unprecedented . . . rainfall and extreme weather events," which

---

[3] Recall that James Schettine is Meridien's general counsel and president, while William Schettine is Meridien's chief executive officer.

required unanticipated maintenance to and installation of ECDs. Using National Oceanic and Atmospheric Administration data, one witness testified that "2018 was the wettest year on record . . . , which is like a 50-year record." Other witnesses similarly described extreme rainfall that year. Several witnesses testified that MarkWest's E&S plans, which it expected Meridien to follow, could not withstand such significant rain events.

¶ 86 This required Meridien to install new ECDs and repair and maintain existing ECDs beyond what was normally required and beyond what the E&S plans required. However, MarkWest witnesses also testified that Meridien's failure to properly install and maintain the ECDs, not the weather, caused the ECDs' failure.

¶ 87 The Contract required Meridien to install and maintain "all environmental controls" described in the E&S plans. But the E&S plans noted that "[a]dditional [E&S] control measures may be required as deemed necessary by . . . [MarkWest]" due to "unforeseen problems." And a Meridien witness testified that it was Meridien's responsibility to "install and maintain any additional erosion and sediment controls BMPs [best management practices]

that may be required."[4]  However, the same witness said that Meridien's initial bid could not have accounted for the significant rainfall and adverse weather.[5]  There was also testimony suggesting that when Meridien attempted to submit a change order for this additional work, MarkWest told it not to deviate from the original E&S plans.  But MarkWest's own reports indicated that it accepted the additional environmental work; one report noted, without apparent disproval, that "environmental crews have begun to install additional ECDs not shown on the E&S Plans."

¶ 88    Finally, although the Contract required change orders for out-of-scope-work, James Schettine testified that Vincent said there would not "be a change order discussion" with respect to the road work.  Vincent also testified that he told James Schettine not to submit change orders.  And Vincent acknowledged that, in a text message in which he wrote that he was in "deny everything

---

[4] One witness testified that BMPs or "best management practices" encompass all environmental controls.

[5] Internal MarkWest correspondence also included a MarkWest employee's email stating that "the contractors use the E[&]S plans for bidding the cost of the controls, so if we don't show which roads need BMPs installed, they will charge extra[] for those BMPs."  This suggests that MarkWest interpreted the Contract to only include the cost of environmental controls listed within the E&S plans.

immediately mode," he was referring to change orders. In his deposition, William Schettine testified that Vincent said "he did not want change orders on this job."

¶ 89 After MarkWest terminated the Contract, Meridien submitted the Invoice for the above-mentioned services and materials. At trial, MarkWest's counsel said there was no need for live testimony about the Invoice, and the district court agreed to hear evidence through offers of proof.

¶ 90 From the evidence presented at trial and the parties' briefing, the district court found that Meridien was entitled to the requested $2,562,994.15 plus interest at a rate of 18% per year. First, it found that Meridien proved the elements required to prevail on an unjust enrichment claim. Next, it found that Meridien could recover for unjust enrichment, despite the underlying Contract, because (1) the work and materials provided pursuant to the Invoice fell outside the Contract's scope and/or were provided after the Contract's execution; and (2) even if the items detailed in the Invoice were subject to Section 4, MarkWest waived any right to rely on that provision because MarkWest accepted Meridien's work, while at the same time rejecting its change order requests.

### B.    Standard of Review

¶ 91    Determining whether a party may recover for unjust enrichments requires "extensive factual findings." *Lewis v. Lewis*, 189 P.3d 1134, 1140 (Colo. 2008). We "defer to the trial court's factual findings unless they are clearly erroneous," *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24, "meaning that we will not disturb those findings unless they are unsupported by the record," *Pinnacol Assurance v. Laughlin*, 2023 COA 9, ¶ 11. However, we review de novo contentions that an express contract bars an unjust enrichment claim. *See Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003). Finally, we review de novo whether a party is entitled to prejudgment interest. *M.G. Dyess, Inc. v. MarkWest Liberty Midstream & Res., L.L.C.*, 2022 COA 108, ¶ 35.

### C.    The Unjust Enrichment Claim

#### 1.    Relevant Law

¶ 92    A party asserting an unjust enrichment claim must prove "that (1) at the plaintiff's expense (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Alderman*, ¶ 35.

However, a party typically cannot assert an unjust enrichment claim "if a valid contract covers the same subject matter." *Id.* at ¶ 36. Our appellate courts recognize two exceptions to this rule: "(1) the express contract fails or is rescinded or (2) the claim covers matters that are outside of or arose after the contract." *Id.* at ¶ 37.

### 2. Analysis

¶ 93 On appeal, MarkWest challenges the district court's ruling for Meridien on its unjust enrichment claim.[6] MarkWest does not contest that Meridien provided the additional work and materials reflected in the Invoice. Instead, it argues that the express Contract (and the jury's finding that there was such a contract) precluded

---

[6] In *M.G. Dyess, Inc. v. MarkWest Liberty Midstream & Resources, L.L.C.*, 2022 COA 108, ¶¶ 12, 14, 21, a division of this court concluded that quantum meruit (unjust enrichment) claims are legal, not equitable, triggering the right to a jury trial. In this appeal, MarkWest does not challenge the propriety of the district court, rather than the jury, deciding Meridien's unjust enrichment claim. *See Melat, Pressman & Higbie, L.L.P. v. Hannon L. Firm, L.L.C.*, 2012 CO 61, ¶ 18 ("[A]rguments not advanced in the trial court and on appeal are generally deemed waived.").

Meridien's recovery for unjust enrichment.[7] MarkWest also does not challenge the court's conclusion that Meridien proved unjust enrichment, noting that the elements are "irrelevant" because the cross-appeal concerns only the district court's conclusion that the Contract's express terms did not bar Meridien's claim. We therefore consider only whether the Contract precluded Meridien's unjust enrichment claim, not the court's ruling on the merits of that claim.

¶ 94 Meridien contends that MarkWest's cross-appeal is underdeveloped and asks us not to reach the merits. We agree that MarkWest's opening brief teeters on the edge of being so sparse as to not warrant our review. It devotes barely more than a page to the first issue and, although it cites the record, it fails to cite any legal authority supporting its position; nor does it address the district court's application of the exceptions to the rule barring unjust enrichment claims. *See* C.A.R. 28(a)(7)(B) (requiring a "discussion

---

[7] MarkWest also contends, in a footnote and without citation, that the district court improperly allowed Meridien to seek breach of contract damages from the jury and then seek the same damages for unjust enrichment after trial. We do not reach this contention because "[w]e don't consider undeveloped and unsupported arguments." *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12, *aff'd*, 2021 CO 56.

of the grounds upon which the party relies . . . with citations to the authorities" relied on).

¶ 95 Nonetheless, because the district court explained the legal authority it relied on in reaching the conclusion MarkWest challenges on appeal, we may review MarkWest's arguments. *See O'Quinn v. Baca*, 250 P.3d 629, 632 (Colo. App. 2010) (reviewing the record despite the parties' failure to provide record citations).

¶ 96 In its reply brief, MarkWest argues that, because the Contract was integrated, the parties' "future *contractual* disputes [were limited] to issues relating to the express provisions of the contract." *Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995) (emphasis added). This misses the point. An unjust enrichment claim typically "does not depend upon the existence of a contract . . . . Rather, it arises out of the need to avoid unjust enrichment" absent an agreement between the parties. *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000). Therefore, an unjust enrichment claim is generally *not* a contractual dispute. And while an unjust enrichment claim cannot proceed merely because the parties omitted or failed to agree to a specific contractual term, a party may recover under unjust enrichment for matters arising *outside of* or

45

after the contract. *Alderman*, ¶¶ 37, 43. An integration clause does not preclude such recovery.

¶ 97 MarkWest further argues that Section 4 of the Contract contemplated changes to the scope of work and therefore precluded Meridien's unjust enrichment claim for out-of-scope work. Beyond noting the district court's conclusion that MarkWest waived any right to rely on Section 4 by refusing to accept change orders, MarkWest fails to substantively address the court's waiver holding. Nor does it address the district court's conclusion that Section 4 did not apply to the work detailed in the Invoice because Section 4 only contemplated out-of-scope work "consistent with the original terms and intent of th[e] Contract."

¶ 98 We first address the court's conclusion that MarkWest waived Section 4's change order provision. "[A] party may waive a contract provision where the party is 'entitled to assert a particular right, knows the right exists, but intentionally abandons that right.'" *Tarco, Inc. v. Conifer Metro. Dist.*, 2013 COA 60, ¶ 33 (citation omitted). For example, waiver occurs when a "party acts inconsistently with the right," and the other party is prejudiced. *Avicanna Inc. v. Mewhinney*, 2019 COA 129, ¶ 25. Whether a

46

provision has been waived "is a factual matter determined by the trial court." *Id.* at ¶ 24.

¶ 99     Here, the district court found — and the record reflects — that MarkWest repeatedly rejected Meridien's efforts to submit change orders. Indeed, as the court noted, MarkWest occasionally documented and observed Meridien performing the out-of-scope work without objecting or requesting change orders. *See Jarosz v. Caesar Realty, Inc.*, 220 N.W.2d 191, 193 (Mich. Ct. App. 1974) (allowing recovery for unjust enrichment, notwithstanding a change order provision, "because defendants were aware of and authorized changes . . . [and] had either waived th[e] [change order] requirement . . . or [the] requirement did not extend to extra work"). The evidence also indicated that MarkWest knew Meridien would request additional compensation (presumably via change orders) for work not explicitly included in the E&S plans, suggesting that it knew this work was outside the Contract's scope. While MarkWest's internal responses to the Demand Letter repeatedly referenced Section 4 and suggested that Meridien should have submitted change orders for the disputed work, MarkWest made

clear to Meridien that it would not accept change orders (while accepting the work).

¶ 100    Therefore, the record supports the district court's findings that MarkWest knew it had a right to request and receive change orders, it intentionally abandoned that right by rejecting them, and it refused to pay Meridien — to Meridien's detriment — for the work it later claimed required change orders.  *See Laughlin,* ¶ 11; *Tarco,* ¶ 33; *Avicanna,* ¶ 25.  On these facts, we cannot say that the district court erred by concluding that MarkWest waived its right to rely on Section 4 and its change order provision.

¶ 101    But whether a party waived a contractual provision and whether such waiver entitles the other party to pursue an unjust enrichment claim are different questions.  The rationale underlying "waiver as an excuse for nonperformance . . . is based in large part on the policies against . . . unjust enrichment."  13 Richard A. Lord, *Williston on Contracts* § 39:15, Westlaw (4th ed. database updated May 2024).  Therefore, waiver of a contractual right generally precludes the waiving party from "seek[ing] judicial enforcement of the contract with regard to the waived performance."  *Id.*; *see also Assocs. of San Lazaro v. San Lazaro Park Props.,* 864 P.2d 111, 111,

115-16 (Colo. 1993) (holding that a breach of warranty action should have been dismissed where the party claiming breach waived the right to rely on the contract's warranty).

¶ 102    Thus, because courts will not enforce waived provisions, we conclude that waiver is sufficiently analogous to the provision having failed that it satisfies the exception under which a party to an express contract may seek restitution for unjust enrichment when the contract (in whole or in part) fails or is rescinded.  *See Alderman,* ¶ 37.  When a party waives a contractual provision that could otherwise block an unjust enrichment claim, the waiving party can no longer rely on that provision, even if the contract as a whole has not failed.

¶ 103    We also conclude that waiving a contractual provision is distinguishable from the circumstances in *Alderman.*  There, Alderman and other students sued Colorado State University (CSU) to recover tuition and fees after the university transitioned to remote services during the COVID-19 pandemic.  *Id.* at ¶¶ 7-11. Although the students "contracted for an in-person education," a "statutory provision . . . granted CSU the authority to suspend university operations in the event of 'the prevalence of fatal

diseases, or other unforeseen calamity.'" *Id.* at ¶¶ 10, 41 (quoting § 23-30-111, C.R.S. 2024). Because the statute was "incorporated into the parties' contract, meaning that the contract explicitly allowed the university to temporarily suspend operations," the court concluded that Alderman could not bring an unjust enrichment claim. *Id.* at ¶¶ 38, 41, 44.

¶ 104 The court held that the statutory provision — which became part of the contract — did not render the contract (or any portion of it) unenforceable. *Id.* at ¶¶ 4, 41. The court reasoned that Alderman's inability to state a claim for breach of contract due to the statutory provision, which allowed the university to suspend operations, differed from the contract being unenforceable. *Id.* A contract fails, the court held, "when it becomes legally unenforceable," not when "it does not provide all the services and protections to which a party claims they are entitled." *Id.* at ¶ 40. Thus, although the contract was silent as to CSU's obligation to issue refunds when it transitioned to remote services, the court held that unjust enrichment is not "a gap-filler provision to provide a remedy when a contract is silent about a desired term." *Id.* at ¶¶ 16-17, 43.

¶ 105   In *Alderman*, the statute effectively created an explicit contractual exception to the requirement that CSU provide in-person services.  So Alderman could not sue for breach of contract or unjust enrichment because an express provision of the contract allowed the allegedly prohibited conduct.  By contrast, waiver is not an explicit provision or exception that becomes part of a contract; instead, it effectively eliminates the waived provision.  In short, Alderman's claims were barred because there *was* an express provision, while a waiving party is barred from enforcing or relying on an express provision that it has disavowed.

¶ 106   Just as a contract's failure or rescission creates an avenue for unjust enrichment recovery because there are no enforceable contractual provisions, waiver results in the waived contractual provision becoming legally unenforceable.  *See Alderman,* ¶ 40; 13 *Williston on Contracts* § 39:15.  Waiver is also different from the parties omitting a term from their agreement, *see Alderman,* ¶ 43, because they did contemplate the term, but it failed.  Allowing claims for unjust enrichment when a contractual provision fails or is rescinded is not the same as allowing an unjust enrichment claim

to serve as a gap-filler for overlooked terms. *See id.* Otherwise, the exceptions discussed in *Alderman* would be meaningless.

¶ 107 Here, there *was originally* a contractual way for Meridien to receive compensation for its additional work; it could submit change orders pursuant to Section 4. Various witnesses testified that MarkWest requested and/or accepted the out-of-scope work, and Meridien tried to submit change orders — but MarkWest repeatedly rejected its attempts, thereby waiving the provision. MarkWest's waiver rendered the change order requirement legally unenforceable, and the parties cite no contractual exceptions or alternatives to that provision. Accordingly, MarkWest's waiver meant that there was *no longer* an enforceable contractual provision covering out-of-scope work, and any such work fell outside of the Contract. *See id.* at ¶ 37. Therefore, to the extent that the disputed work and materials were originally subject to Section 4's change order requirement, the district court did not err by concluding that MarkWest's waiver of this section allowed Meridien's unjust enrichment claim to proceed.

¶ 108 Second, even absent MarkWest's waiver, we cannot say that the district court erred by concluding that the items in the Invoice

were not "consistent with the original terms and intent of th[e] Contract" and therefore fell outside Section 4's scope. A party may recover for unjust enrichment if "substantial changes occur that are not covered by the contract and are not within the contemplation of the parties, and when the effect of such changes is to require extra work or to cause substantial loss to one party." *Specialized Grading Enters., Inc. v. Goodland Constr., Inc.*, 181 P.3d 352, 354-55 (Colo. App. 2007); *see also V.C. Edwards Contracting Co. v. Port of Tacoma*, 514 P.2d 1381, 1386 (Wash. 1973) (applying the same principle and noting that "[t]he critical factor . . . is whether the [party] should have discovered or anticipated the changed condition").

¶ 109    In *Specialized Grading Enterprises*, a subcontractor brought an unjust enrichment claim for extra work, and "[t]he contractor argued that the [extra work] was . . . expressly provided for in the general contract," and the contract's change order procedure provided "an adequate contractual remedy." 181 P.3d at 355. A division of this court reversed the directed verdict on the unjust enrichment claim, reasoning that (1) the parties did not follow the change order procedure; (2) the work the subcontractor performed

53

was the contractor's responsibility; (3) "[t]he subcontractor could not have reasonably anticipated that the contractor" would not perform; and (4) "the contractor was aware of the problem and the subcontractor's efforts." *Id.* at 356.

¶ 110   Here, the district court first found that Meridien's slip work fell outside the scope of Section 4. Like *Specialized Grading Enterprises*, MarkWest's internal response to Meridien's letter acknowledged that Meridien was not responsible for the slip work that MarkWest directed it to perform, and William Schettine testified that the work "had nothing to do with" the underlying project.

¶ 111   Second, with respect to the roadwork, MarkWest's internal document suggested that Meridien should have included the work in its bid or submitted a change order. However, the Contract was executed on March 9, 2018, and testimony suggested that the earliest conversations about potential out-of-scope roadwork began in late March 2018. Therefore, the evidence indicated that this work arose after the Contract was executed and could not have been included in the bid. *See Alderman,* ¶ 37.

¶ 112   Furthermore, the court found that Meridien's work to "build, grade, stone, and ditch" several miles of roads did not align with the Contract's original terms and intent.  The Contract primarily addressed Meridien's duty to repair and maintain existing roads — not build new roads — and MarkWest specifically asked Meridien to complete the additional work, suggesting that it knew the work was not within the Contract's scope.  There was also no testimony about how this roadwork related to the underlying project.

¶ 113   Third, while the Contract contemplated unidentified foreign lines and barred additional compensation for work related to such lines, the evidence established that the number of lines was unprecedented.  In these circumstances, the district court could reasonably conclude that neither the Contract nor the parties contemplated the extent of these unidentified lines.  *See Specialized Grading Enters.*, 181 P.3d at 354-55; *see also French*, ¶ 25 ("In interpreting a contract, our primary goal is to give effect to the parties' intent.").  Moreover, MarkWest was responsible for identifying the lines, and Meridien could not have reasonably anticipated that it would fail to identify more than fifty lines

(including those belonging to MarkWest). *See Specialized Grading Enters.*, 181 P.3d at 356.

¶ 114    Finally, there was evidence that the parties could not have reasonably anticipated the unprecedented rain and adverse weather events that created unforeseen environmental work. *See id.* at 354-56. While the Contract contemplated the need for additional ECDs, the weather events created a substantial change that required significant additional work. *See id.* at 354-55. Seeking to effectuate the parties' intent, the district court could reasonably have interpreted the Contract's broad language about a potential need for more environmental controls as not encompassing multiple severe storms and record amounts of rain. *See French*, ¶ 25.

¶ 115    And while there was conflicting testimony about what the parties viewed as included in the Contract's scope, we defer to the district court's findings on witness credibility and conflicting testimony. *See In re Estate of Owens*, 2017 COA 53, ¶ 22. In short, the evidence supported the district court's factual findings. *See Laughlin*, ¶ 11. And we cannot say that the court erred by concluding that Meridien's unjust enrichment claim could proceed under the enumerated exceptions. *See Alderman*, ¶ 37.

## D. The Prejudgment Interest Rate

### 1. Relevant Law

¶ 116   "[T]he remedy for unjust enrichment is payment of the value of the benefit conferred, otherwise known as restitution." *Air Sols., Inc. v. Spivey*, 2023 COA 14, ¶ 104. The United States Supreme Court has recognized that, while a wrongdoer should not profit from wrongdoing, "the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 80 (2020) (alteration in original) (citation omitted). Therefore, a party entitled to restitution for unjust enrichment can generally recover "restitution in the amount of enrichment received, . . . [which] is often, but not always, coextensive with the [entitled] party's loss." *Sterenbuch v. Goss*, 266 P.3d 428, 437 (Colo. App. 2011) (citation omitted); *see also Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 89 (D.D.C. 2019) (noting that an award of prejudgment interest must "not overcompensate a plaintiff") (citation omitted).

¶ 117   Divisions of this court have held that a party that prevails on an unjust enrichment claim is entitled to prejudgment interest. *See Murdock v. Cohen*, 762 P.2d 691, 693 (Colo. App. 1988) (citing § 5-

12-102(3), C.R.S. 2024); *M.G. Dyess*, ¶¶ 36-37.  However, these divisions applied the statutory interest rate applicable when there is no agreement as to a specific interest rate.  *See Murdock*, 762 P.2d at 693; *M.G. Dyess*, ¶¶ 35-36.  The Restatement (Third) of Restitution & Unjust Enrichment § 53 cmt. e (Am. L. Inst. 2011), contemplates a similar approach, suggesting that courts apply the statutory prejudgment interest rate or, absent a statutory rate, "the rate that most closely reflects the value to the defendant of the interim use of the claimant's funds."

### 2.    Analysis

¶ 118    After the district court awarded Meridien restitution and prejudgment interest of "1.5% per month (18% per annum)," MarkWest filed a C.R.C.P. 59(a) motion, requesting an interest rate of 8%, pursuant to section 5-12-101, C.R.S. 2024, rather than the Invoice's 18% interest rate.  In an amended judgment, without explaining its reasoning, the court reiterated Meridien's entitlement "to prejudgment interest at a rate of 18% per annum . . . from December 6, 2018, to entry of judgment."

¶ 119    On appeal, MarkWest contends that the district court's finding for Meridien on its unjust enrichment claim (i.e., a claim not

premised on an underlying agreement) necessarily supports the conclusion that the parties did not agree to the Invoice's interest rate; therefore, the statutory rate should apply. Meridien responds that MarkWest agreed to the Invoice's interest rate because other Meridien invoices, which MarkWest paid "without objection," reflected the same rate.[8]

¶ 120    To support its argument, Meridien cites a case in which a division of this court concluded that evidence of "more than fifty invoices" submitted over multiple years and all containing an 18% interest rate was sufficient evidence of a "course of dealing" such that the jury could conclude that the invoices' interest rate "was included in the parties' agreement." *Murray Equip. Co. v. Curtis, Inc.*, 725 P.2d 35, 38 (Colo. App. 1986). But *Murray* is distinguishable from the circumstances here. First, Meridien cites no evidence suggesting that its relationship with MarkWest was as long (or involved as many invoices) as in *Murray*. *See id.*

---

[8] Beyond the Invoice at issue, we identified three mentions of an 18% interest rate in the record: two other invoices and one letter from Meridien.

¶ 121    Second, the award in *Murray* included breach of contract damages and "interest under the contract." *Id.* at 37-38. Here, Meridien's restitution award was explicitly *not* "under the contract" and did not arise from a contractual claim. The basis for the award in *Murray* was the contract, and the division concluded that the interest rate was part of that agreement. *Id.* at 38. Here, the Contract was not the basis for the award, nor did the district court find that the Invoice created a new contract or that the Invoice's interest rate became part of the Contract. In short, the court could not award restitution based on the lack of an agreement but then conclude that the parties had an agreement as to the interest rate applicable to the restitution awarded.

¶ 122    For the foregoing reasons, we conclude that Meridien was entitled to the statutory interest rate of 8% per year, not the 18% interest rate in the Invoice. *See* § 5-12-101; § 5-12-102(1)(b). This conclusion aligns with the Restatement's and other divisions' applications of the statutory interest rate to unjust enrichment claims. *See Murdock*, 762 P.2d at 693; Restatement (Third) of Restitution & Unjust Enrichment § 53 cmt. e. Applying the lower interest rate also supports an award that is "coextensive with

60

[Meridien's] loss," *Sterenbuch*, 266 P.3d at 437 (citation omitted), and avoids overcompensating Meridien. *See Maupin*, 405 F. Supp. 3d at 89.

¶ 123 Therefore, we remand to the district court to (1) correct the judgment to reflect an 8% interest rate on Meridien's restitution award; and (2) recalculate the interest owed accordingly.

## IV. Disposition

¶ 124 The judgment is affirmed in part and reversed in part with instructions to the district court to correct the final judgment's interest rate applicable to Meridien's unjust enrichment award.

JUDGE GOMEZ and JUDGE LUM concur.